# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

<div style="color:red">REDACTED VERSION</div>

| | | |
|---|---|---|
| SCIENCE APPLICATIONS INTERNATIONAL CORPORATION | ) ) | |
| Plaintiff, | ) | Case No. 25-1739 |
| | ) | |
| v. | ) | Judge Meriweather |
| | ) | |
| UNITED STATES OF AMERICA, | ) | ███████████ |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| CACI NSS, LLC | ) | |
| | ) | |
| Intervenor Defendant. | ) | |

## INTERVENOR DEFENDANT CACI NSS, LLC'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION  FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Dated: December 5, 2025

Alexander O. Canizares
*Counsel of Record*
Vinson & Elkins L.L.P.
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
(202) 639-6540
acanizares@velaw.com

*Counsel for Intervenor Defendant*
*CACI NSS, LLC*

*Of counsel:*
Tyler E. Robinson
Trobinson@velaw.com
Leslie Edelstein
Ledelstein@velaw.com
Vinson & Elkins L.L.P.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................iii

I.  INTRODUCTION ............................................................................................. 1

II.  QUESTIONS PRESENTED.............................................................................. 5

III.  STATEMENT OF THE CASE........................................................................... 5

IV.  ARGUMENT..................................................................................................... 5

    A.  Standard Of Review .............................................................................. 5

    B.  DHS's Evaluation Of SAIC Under Factor 2 Was A Rational Exercise Of Its Discretion And Neither Arbitrary Nor Capricious............................................ 9

        1.  DHS's Judgment Regarding SAIC's Program Manager's Lack Of DHS Experience Is Reasonable And Consistent With The RFQ. ............. 9

        2.  SAIC Fails To Demonstrate Any Error In DHS's Evaluation Of SAIC's Use Of ████████████ ................................................... 13

        3.  The Agency Did Not Apply Unstated Evaluation Criteria When Observing Flaws In SAIC's Approach. ................................................ 16

        4.  SAIC Has Only Itself To Blame For Errors In Its Quotation. ................. 17

        5.  DHS Rationally Determined That SAIC's Quotation Reflected "Outdated" Technical Knowledge. .......................................................... 19

        6.  SAIC's Unequal Treatment Argument As To Factor 2 Fails. .................. 21

    C.  DHS's Evaluation Of SAIC's Quotation Under Factor 3 Was Not Unequal. .......................................................................................................... 25

        1.  SAIC Has Not Demonstrated That Its Quotation Was "Substantively Indistinguishable" From CACI's Quotation..................... 26

        2.  SAIC Cannot Establish Any Prejudice From The Alleged Disparate Treatment. .............................................................................. 28

    D.  DHS's Determination That CACI Is The Best Value Is Sound And In Accordance With The RFQ. .................................................................. 30

i

1.  DHS Meaningfully Considered The Total Average Labor Rate Price Differences Between CACI And SAIC And Reasonably Determined That CACI Was The Best Value Based On Its Superior Technical Approach. .................................................................. 32

2.  SAIC's Second Challenge To DHS's Best Value Tradeoff Is Derivative Of Its Other Protest Grounds And Therefore Fails. ................ 38

E.  SAIC Fails to Demonstrate Prejudice .................................................................. 39

F.  SAIC's Request For A Permanent Injunction Should Be Denied. ........................ 42

V.  CONCLUSION ............................................................................................................. 44

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                    **Page(s)**

*22nd Century Techs., Inc. v. United States,*
   176 Fed. Cl. 389 (2025) ............................................................................................... 22

*22nd Century Techs., Inc. v. United States,*
   No. 21-1137C, 2021 WL 3856038 (Ct. Cl. July 21, 2021) ......................................... 8

*AccelGov, LLC v. United States,*
   174 Fed. Cl. 212 (2024) ............................................................................................... 7

*Ace-Federal Reporters, Inc. v. United States,*
   150 Fed. Cl. 94 (2020) ............................................................................................... 42

*Advanced Data Concepts, Inc. v. United States,*
   216 F.3d 1054 (Fed. Cir. 2000) .................................................................................... 6

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
   586 F.3d 1372 (Fed. Cir. 2009) .................................................................................. 18

*Allied Tech. Grp., Inc. v. United States,*
   649 F.3d 1320 (Fed. Cir. 2011) .............................................................................. 9, 43

*Allied Tech. Grp., Inc. v. United States,*
   94 Fed. Cl. 16 (2010) ...................................................................................... 9, 35, 36

*Ascendant Servs., LLC v. United States,*
   160 Fed. Cl. 275 (2022) ........................................................................................ 29, 34

*ASRC Fed. Tech. Sols., LLC v. United States,*
   169 Fed. Cl. 372 (2024) ............................................................................................. 17

*Banknote Corp. of Am., Inc. v. United States,*
   365 F.3d 1345 (Fed. Cir. 2004) .................................................................................... 8

*Banknote Corp. of Am., Inc. v. United States,*
   56 Fed. Cl. 377 (2003) ...................................................................... 8, 10, 13, 14, 19

*Benchmade Knife Co. v. United States,*
   79 Fed. Cl. 731 (2007) ................................................................................................. 7

*Beta Analytics Int'l, Inc. v. United States,*
   67 Fed. Cl. 384 (2005) ................................................................................................. 7

*Blackwater Lodge & Training Ctr., Inc. v. United States,*
   86 Fed. Cl. 488 (2009) ......................................................................................... 10, 41

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ..................................................................................................... 6

*Chromalloy San Diego Corp. v. United States*,
   145 Fed. Cl. 708 (2019) ............................................................................................ 48

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..................................................................................................... 6

*Connected Global Solutions, LLC v. United States*,
   162 Fed. Cl. 720 (2022) ............................................................................................ 40

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*,
   357 F.3d 1294 (Fed. Cir. 2004) .................................................................................. 6

*Data Gen. Corp. v. Johnson*,
   78 F.3d 1556 (Fed. Cir. 1996) ............................................................................ 42, 43

*Dell Fed. Sys., L.P. v. United States*,
   906 F.3d 982 (Fed. Cir. 2018) .................................................................................. 47

*Distributed Sols., Inc. v. United States*,
   106 Fed. Cl. 1 (2012) ..................................................................................... 10, 36, 41

*Dyonyx, L.P. v. United States*,
   83 Fed. Cl. 460 (2008) .............................................................................................. 47

*E.W. Bliss Co. v. United States*,
   77 F.3d 445 (Fed. Cir. 1996) .................................................................... 8, 28, 29, 35

*Exelis Sys. Corp.*,
   B-407111, Nov. 13, 2012, 2012 CPD ¶ 340 ........................................................... 13

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................................... 7

*Forestry Surveys & Data v. United States*,
   44 Fed. Cl. 493 (1999) ................................................................................... 13, 14, 19

*G4S Secure Sols. (USA), Inc. v. United States*,
   146 Fed. Cl. 265 (2019) .............................................................................................. 9

*G4S Secure Sols. (USA), Inc. v. United States*,
   829 F. App'x 518 (Fed. Cir. 2020) ............................................................................. 9

*Galen Med. Assocs., Inc. v. United States*,
   369 F.3d 1324 (Fed. Cir. 2004) ........................................................................... 10, 35

*Global Dynamics, LLC v. United States,*
138 Fed. Cl. 207 (2018) ................................................................................... 48

*Harmonia Holdings Grp., LLC v. United States,*
167 Fed. Cl. 448 (2023) ................................................................................... 18

*IAP World Servs., Inc. v. United States,*
152 Fed. Cl. 384 (2021) ................................................................................... 44

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
238 F.3d 1324 (Fed. Cir. 2001) ......................................................................... 7

*Integrated Fin. & Acct. Sols., Inc. v. United States,*
161 Fed. Cl. 475 (2022) ...................................................................... 10, 17, 18

*Kerr Contractors, Inc. v. United States,*
374 F. App'x 979 (Fed. Cir. 2010) ................................................................... 15

*Kerr Contractors, Inc. v. United States,*
89 Fed. Cl. 312 (2009) ..................................................................................... 14

*LB&B Assocs., Inc. v. United States,*
160 Fed. Cl. 710 (2022) ................................................................................... 31

*Lockheed Missiles & Space Co. v. Bentsen,*
4 F.3d 955 (Fed. Cir. 1993) ............................................................................... 6

*Matt Martin Real Estate Mgmt. LLC v. United States,*
96 Fed. Cl. 106 (2010) ..................................................................................... 35

*Mission1st Grp., Inc. v. United States,*
144 Fed. Cl. 200 (2019) ................................................................................... 21

*Mitchco Int'l, Inc. v. United States,*
151 Fed. Cl. 537 (2020) ................................................................................... 48

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................................... 18

*Nat'l Energy Sec. Operations, LLC v. United States,*
No. 25-774, 2025 WL 3265335 (Fed. Cl. Sept. 30, 2025) ............................... 46

*Newimar S.A. v. United States,*
160 Fed. Cl. 97 (2022) ............................................................ 13, 42, 43, 45, 46

*Newimar S.A. v. United States,*
No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) ......................... 13

*Office Design Grp. v. United States*,
951 F.3d 1366 (Fed. Cir. 2020) ................................................................. 24, 25, 28, 29, 32

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) ............................................................................... 47

*Planetspace Inc. v. United States*,
96 Fed. Cl. 119 (2010) ......................................................................................... 9

*PricewaterhouseCoopers Pub. Sector, LLP v. United States*,
126 Fed. Cl. 328 (2016) ...................................................................................... 16

*Redland Genstar, Inc. v. United States*,
39 Fed. Cl. 220 (1997) ......................................................................................... 6

*Reli Grp., Inc. v. United States*,
174 Fed. Cl. 630 (2025) ................................................................................... 9, 37

*SSI Claimsnet, LLC v. United States*,
170 Fed. Cl. 725 (2024) ............................................................................. 16, 21, 47

*Statistica, Inc. v. Christopher*,
102 F.3d 1577 (Fed. Cir. 1996) ............................................................................. 43

*STG Int'l, Inc. v. United States*,
165 Fed. Cl. 577 (2023) ...................................................................................... 34

*Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*,
89 Fed. Cl. 735 (2009) ................................................................................... 21, 22

*Superior Waste Mgmt. v. United States*,
169 Fed. Cl. 239 (2024) ...................................................................................... 45

*Sys. Stud. & Simulation, Inc. v. United States*,
22 F.4th 994 (Fed. Cir. 2021) ............................................................................... 42

*TISTA Sci. & Tech. Corp. v. United States*,
177 Fed. Cl. 600 (2025) ................................................................................... 25, 26

*Torres Advanced Enter. Sols., LLC v. United States*,
133 Fed. Cl. 496 (2017) ...................................................................................... 48

*Trillion ERP Venture Tech LLC v. United States*,
161 Fed. Cl. 531 (2022) .................................................................................... 9, 35

*United States v. John C. Grimberg Co.*,
702 F.2d 1362 (Fed. Cir. 1983) ............................................................................. 47

*Vertex AeroSpace, LLC v. United States*,
   142 Fed. Cl. 755 (2019) ................................................................................... 36

**Statutes**

28 U.S.C. § 1491(b)(2) ...................................................................................... 42

28 U.S.C. § 1491(b)(4) ........................................................................................ 5

5 U.S.C. § 706 ...................................................................................................... 5

5 U.S.C. § 706(2)(A) ............................................................................................ 5

**Other Authorities**

FAR 15.306(a)(2) ............................................................................................... 18

FAR 8.4 .............................................................................................................. 18

FAR 8.405-2(f) ................................................................................................... 15

FAR 8.405-2(f)(5) ..................................................................................... 7, 32, 33

FAR 8.405-3(a)(7)(viii) .................................................................................. 8, 32

**Rules**

RCFC 52.1 .......................................................................................................... 1, 5

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), intervenor-defendant, CACI NSS LLC ("CACI"), respectfully submits this cross-motion for judgment on the administrative record and response to the motion for judgment on the administrative record filed by plaintiff, Science Applications International Corp. ("SAIC"), ECF No. 24 ("Pl. Br.").

## I.   INTRODUCTION

It is settled law in this Circuit that procuring agencies are entitled to substantial deference when it comes to evaluations, especially regarding technical matters. As this precedent recognizes, agencies—not this Court—are in the best position to evaluate their needs and weigh value tradeoffs, including sometimes selecting a higher-rated contractor at a higher price. The Court's standard of review is deferential, and the burden on the protester to establish a prejudicial procurement error is heavy. And in procurements governed by Federal Acquisition Regulation ("FAR") Subpart 8.4 such as this one, an agency's obligation to document its evaluation decisions is especially lenient and not subject to judicial second-guessing. In short, as long as the agency's decision is rational, and neither arbitrary nor capricious, it should not be disturbed.

This precedent compels this Court to reject SAIC's post-award bid protest, which amounts to an improper effort to have the Court substitute its judgment for that of the Department of Homeland Security ("DHS" or the "Agency") on a series of technical matters. DHS reasonably determined that CACI, the incumbent contractor, was the best value quoter for the Blanket Purchase Agreement ("BPA") to provide desktop support services to 18,500 DHS employees and contractors known as Desktop Support Services ("DSS") 3.0 (RFQ No. 70RTAC25Q00000011). DHS gave CACI the highest technical ratings of any quoter—rating it with High Confidence across the board—and the Agency's technical evaluators identified numerous features in CACI's

1

quotation that gave them heightened expectations of success. By contrast, DHS exhaustively explained why SAIC had received only a Some Confidence rating under Factor 2, finding that various factors (SAIC's Program Manager lacked DHS experience, aspects of SAIC's proposed solution were outdated or inaccurate) undermined their confidence in SAIC's ability to successfully perform. And after considering these evaluations, DHS concluded and documented that CACI's superior technical approach was worth paying a price premium relative to SAIC's lower-priced but technically inferior quotation. This best value tradeoff complied with the terms of the Request for Quotes ("RFQ" or "Solicitation"), which explicitly stated that, when combined, Factor 1 (Corporate Experience), Factor 2 (Management Approach and Key Personnel), and Factor 3 (Technical Solution), were more important than price. Although the RFQ stated that price might become more important in selecting the successful quoter "as technical quotes become more comparable," that did not happen here because CACI's technical superiority was unmatched.

Undermining its effort to overturn this best value tradeoff, SAIC does not even challenge DHS's evaluation of CACI on which the tradeoff is based. Notably, even after gaining access to CACI's technical quotation in the record, SAIC does not dispute any aspect of DHS's technical evaluation of CACI, except to argue that SAIC and CACI were treated disparately in a few, isolated instances (arguments the record refutes). For example, SAIC does not contest the Agency's across-the-board High Confidence ratings for CACI, which are supported by extensive and thoroughly documented findings. Instead, SAIC focuses its protest narrowly on DHS's evaluation of its own quotation, arguing that DHS's Some Confidence rating is unreasonable and a departure from the RFQ. But as explained below, these arguments fail.

- SAIC wrongly asserts that its Program Manager's lack of DHS experience was unreasonably evaluated. Contrary to SAIC's argument, the RFQ gave DHS ample

discretion to consider a Program Manager's qualifications ***and experience***, and its assessment regarding SAIC's Program Manager is reasonable and factually accurate.

- SAIC's argument that DHS unreasonably assessed SAIC's proposed "██████████ ██████" merely asks the Court to second-guess DHS's discretionary technical judgments relating to a vague and undefined term ("████████") that the Agency had broad discretion to interpret. That the Agency was unimpressed by SAIC's ████████████████ is entirely proper.

- DHS did not apply unstated evaluation criteria when determining that certain aspects of SAIC's quotation could conflict with consistency and reliability. Rather, DHS reasonably exercised its discretion in evaluating SAIC's quotation and properly documented its reasoning.

- DHS's decision to negatively assess SAIC's use of incorrect and misleading statements in its technical quotation is rational and supported by the record. The Agency reasonably interpreted SAIC's statements to be inaccurate and potentially misleading. SAIC's efforts to shift blame for its own errors fail.

- SAIC fails to establish that DHS improperly determined that SAIC's proposal reflected "outdated" technical knowledge regarding ████████████. The record refutes SAIC's argument and supports the Agency's reasonable decision.

- SAIC is unable to demonstrate that DHS unequally evaluated SAIC's quotation under Factor 2 as compared to CACI's. To the extent that SAIC and CACI were rated differently, it is because they had different technical approaches, as the record establishes. There was no disparate treatment.

- SAIC likewise fails to show unequal treatment with respect to DHS's evaluation of SAIC under Factor 3. Here again, SAIC fails to show that its quotation was substantially indistinguishable from CACI's. The record shows that the quoters had different approaches and were fairly and equally treated.

- DHS's best value tradeoff was rational. As noted above, SAIC does not challenge any of the technical judgments underling CACI's superiority. In finding that a price premium was justified, the Agency made a reasoned judgment that did not neglect SAIC's lower price. The Agency properly considered the price differential between CACI and SAIC based on average labor hours. It selected CACI—the highest-rated quoter—based on a careful and thorough judgment as to the costs and benefits of each offeror's quotation, as the RFQ allows. SAIC's argument that that DHS ignored a $███████ price difference is simply wrong; that figure is nowhere in the record and based on unsupported assumptions.

- Even assuming for argument's sake that SAIC can succeed on one or more of its protest grounds, SAIC fails to demonstrate that it has been prejudiced. There is no basis to conclude that, but for the alleged errors, SAIC had a substantial chance at winning the DSS 3.0 contract. Accordingly, its protest must fail.

- Finally, SAIC does not satisfy its burden of proving that it is entitled to injunctive relief. A permanent injunction simply is not warranted here.

For these reasons, as explained in detail below, the Court should deny SAIC's motion for judgment on the administrative record, grant the motions filed by the Government and CACI, and enter judgment for the Government and CACI accordingly.

4

## II.    QUESTIONS PRESENTED

1.      Whether SAIC has established that DHS's technical evaluation of SAIC's quotation under Factor 2 was irrational or contrary to the RFQ.

2.      Whether SAIC has established that DHS treated SAIC unequally in its evaluation of SAIC's quotation under Factors 2 and 3.

3.      Whether DHS reasonably determined that CACI is the best value quoter.

4.      Whether SAIC has established that it has been prejudiced by the alleged errors.

5.      Whether SAIC is entitled to a permanent injunction.

## III.    STATEMENT OF THE CASE

This post-award protest arises out of DHS's award of a BPA to CACI to provide IT support services under the Office of Procurement Operations ("OPO") Information Technology Acquisition Center ("ITAC").  DHS concluded that CACI represented the best value for DSS 3.0 based on a thorough and well-documented evaluation.  SAIC challenges DHS's evaluation of SAIC as arbitrary and capricious and contrary to the RFQ, but as explained below, these arguments all fail.

## IV.    ARGUMENT

### A.    Standard Of Review

The Court decides a motion for judgment on the administrative record pursuant to RCFC 52.1.  Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review set forth in section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under this standard, the Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

5

In reviewing the agency's decisions under the APA standard, the Court does not substitute its judgment for that of the agency. *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004); *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997). The agency's decision is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and the APA standard applied to bid protests is "highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As the United States Court of Appeals for the Federal Circuit has recognized, "[e]ffective contracting demands broad discretion" and agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993) (citation omitted).

This Court is required to "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). The contracting officer is "entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks and citation omitted). Thus, "the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (internal quotation marks and citations omitted). "This standard applies even if the clarity of the agency's decision is 'less than ideal' so long as 'the agency's path may reasonably be discerned.'" *AccelGov, LLC v. United States*, 174 Fed. Cl. 212, 224 (2024) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)).

Such deference to the agency's expertise is particularly great in matters involving technical evaluations. *See Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."). Protests involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003) ("naked claims" of disagreement with evaluations, "no matter how vigorous, fall far short of meeting" the heavy burden of demonstrating that findings "were the product of an irrational process and hence were arbitrary and capricious"), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Similarly, FAR Subpart 8.4 procurements such as this one have "few applicable procedures because such procurements are meant to be simple and flexible and, importantly, . . . agencies need only provide a rational and reasonable basis for award decisions." *22nd Century Techs., Inc. v. United States*, No. 21-1137C, 2021 WL 3856038, at *7 (Ct. Cl. July 21, 2021) (non-published). Under a procurement pursuant to FAR Subpart 8.4 rather than FAR Part 15, the Agency is not subject to the same documentation requirements applicable to FAR Part 15. *See* FAR 8.405-2(f)(5) (imposing "minimum" documentation requirements). In particular, the agency need only document the "[b]asis for the award decision" that includes "the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work." FAR 8.405-

7

3(a)(7)(viii). In this regard, "[t]he amount of documentation required in a FAR 8.4 streamlined procurement is far less than that required by FAR 15." *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 270 (2019), *aff'd*, 829 F. App'x 518 (Fed. Cir. 2020); *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010) ("The very purpose of FAR Part 8 is to provide a more simplified and flexible approach away from the more formal and rigorous procedures for negotiated procurements" in FAR Part 15) (internal quotation marks and citation omitted), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011). FAR Subpart 8.4, "unlike FAR Part 15, does not require an agency to 'document every decision it makes in rigorous detail.'" *Reli Grp., Inc. v. United States*, 174 Fed. Cl. 630, 641 (2025) (quoting *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 554 (2022)).

Also, "[a]n agency's contract award is . . . least vulnerable to challenge when based upon a best value determination." *Planetspace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). A best-value determination should not be disturbed so long as the agency "documents its final award decision and includes the rationale for any business judgments and tradeoffs made." *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009). "Mere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious." *Id.* And an even "lower threshold applies for a FAR Part 8 tradeoff analysis." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013). In a FAR Part 8.4 procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols., Inc. v. United States*, 161 Fed. Cl. 475, 496 (2022) (citation omitted).

Finally, to prevail, a protester must establish that procurement errors are prejudicial. *See Banknote*, 56 Fed. Cl. at 384 (even if the protester's assertions were true, "they would produce either negligible increases in its technical score or, correspondingly, negligible decreases in the scores of its competitors—generating a theoretical impact far less than what would be required to bring [the protester] within the realm of any likelihood of receiving an award").

**B.      DHS's Evaluation Of SAIC Under Factor 2 Was A Rational Exercise Of Its Discretion And Neither Arbitrary Nor Capricious.**

As noted above, DHS assigned SAIC a "Some Confidence" rating under Factor 2 (Management Approach and Key Personnel) based upon an evaluation of SAIC's technical quotation. SAIC challenges this rating on grounds that: (1) the Agency unreasonably "downgraded" SAIC because its proposed Program Manager lacked DHS experience; (2) DHS misevaluated SAIC's proposed use of ███████████████ for its ██████████████ ███████████████; (3) DHS improperly applied unstated evaluation criteria when evaluating SAIC's ███; (4) DHS misconstrued statements in SAIC's quotation regarding ██████████; (5) DHS's determination that SAIC's Management Approach reflected "outdated" technical knowledge concerning ██████████ was flawed; and (6) DHS unequally evaluated SAIC's quotation under Factor 2 by failing to credit SAIC's Service Level Agreement ("SLA") approach in the same way it credited CACI's approach. Pl. Br. at 14-28. As explained below, each of these arguments fails on its merits and amounts to mere disagreement with the Agency's reasonable judgments.

**1.      DHS's Judgment Regarding SAIC's Program Manager's Lack Of DHS Experience Is Reasonable And Consistent With The RFQ.**

SAIC first challenges DHS's evaluation of its Program Manager under Factor 2. Pl. Br. at 14-16; Am. Compl. ¶¶ 28-37 (Count I). SAIC argues that DHS departed from the RFQ, applied

unstated evaluation criteria, and penalized SAIC by making "DHS-specific background into a de facto requirement." Pl. Br. at 15-16. Each of these arguments lacks merit.

Offerors were required to submit a Technical volume (Volume 2) to be evaluated under Factor 2 (Management Approach and Key Personnel) and Factor 3 (Technical Solution). AR Tab 58g at 602. Under Factor 2, quoters were required to propose a Management Approach. *Id.* at 605. Quoters were required to provide a resume for the Program Manager, the sole Key Personnel for DSS 3.0. *Id.* at 606, 645. Resumes were required to "describe, at a minimum, the candidate's education, experience, and certifications demonstrating that they meet all required minimum qualifications for the position proposed." *Id.* at 606. Resumes also were required to include, among other things:

> Experience (including, in reverse chronological order, area(s) of work in which a person is qualified, company and title of position, approximate starting and ending dates (month/year), [and] concise descriptions of experience for each position held.

*Id.* The Program Manager would be evaluated based on his or her: (1) qualifications regarding education and professional certifications/credentials; and (2) qualifications regarding "the experience in similar projects (size, scope, magnitude, duration, and complexity, etc.)." *Id.* at 612.

In his best value recommendation, the Contracting Officer ("CO") credited SAIC's Program Manager (███████████ for his qualifications and experience managing "large programs with similar requirements to DSS 3.0." AR Tab 103 at 2702; *see also* AR Tab 101 at 2671 (Technical Evaluation Team ("TET") cited Mr. ████████ credentials and experience). However, the CO identified Mr. █████████ "lack of DHS domain experience" as among several factors that "reduce confidence" in SAIC's "ability to deliver the highest quality program management for DSS 3.0." AR Tab 103 at 2702. Likewise, the Selecting Official noted Mr.

10

████████ lack of "DHS experience" as "reduc[ing] confidence in SAIC's ability to deliver reliable program management for DSS 3.0."  AR Tab 104 at 2717.

An agency has "great discretion in determining the scope of an evaluation factor." *Banknote*, 56 Fed. Cl. at 386-87 (citation omitted).   A solicitation "need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Id.* at 387 (citation omitted).  As this Court has explained, "[w]hen weighing the merits of a proposal under a specific evaluation factor, an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor." *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 497 (1999) (internal quotation marks and citation omitted).  To succeed on an unstated evaluation criteria claim, a protester must show both that (1) the "procuring agency used a significantly different basis in evaluating the proposals than was disclosed" and (2) "the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." *Banknote*, 56 Fed. Cl. at 386-87; *accord Newimar S.A. v. United States*, 160 Fed. Cl. 97, 128-29 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023).

SAIC fails to meet this high standard.  Contrary to its arguments, DHS did not use a "significantly different basis" than from the RFQ for evaluation when it considered SAIC's Program Manager's experience and its implications.[1]  Given that DSS 3.0 is a procurement of IT services *for DHS*, and given that the Program Manager is *the sole Key Personnel* position in the

---

[1] SAIC's reliance on *Exelis Sys. Corp.*, B-407111, Nov. 13, 2012, 2012 CPD ¶ 340, is misplaced. Pl. Br. at 15.   Unlike the RFQ at issue here, *Exelis* did not involve a Program Manager's qualifications.  Also, the evaluation criteria at issue in *Exelis* is dissimilar to those at issue here, which required DHS to evaluate Program Managers based on qualifications and experience with projects of similar size, scope, magnitude, duration, and complexity—criteria that logically encompass considering a Program Manager's prior DHS experience.  AR Tab58g at 612.

████████████████████████████████

11

RFQ, it is logical and consistent with the RFQ to consider a Program Manager's past experience **with DHS**. Indeed, the RFQ requires DHS to evaluate a Program Manager's experience with projects of similar size, scope, magnitude, duration, and complexity. AR Tab58g at 612. The RFQ also required the Program Manager's resume to include various information about his or her background and experience "at a minimum"—signaling that experience with DHS was fair game. AR Tab58g at 606. That the RFQ evaluation factor for Program Managers did not explicitly identify DHS experience is irrelevant. Such information was reasonably "within the scope of the factor" and thus properly weighed. *Forestry Surveys & Data*, 44 Fed. Cl. at 497.

SAIC's suggestion that, without explicit reference to DHS experience in the RFQ's evaluation scheme, the Agency was precluded from even considering a Program Manager's experience with DHS is contrary to the law and defies common sense. *See Banknote*, 56 Fed. Cl. at 387 (downgrading a contractor for lacking experience as a prime contractor was not an improper use of unstated evaluation criteria because, "[e]ven if the contract had not so provided, the [agency] still would have been entitled to consider generically an offeror's experience in performing the specific tasks that were the subject of the procurement"); *Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 327-28 (2009) ("What plaintiff suggests are mandatory minimum requirements are merely the intrinsic elements of a technically sound, safe and acceptable proposal . . . ."), *aff'd*, 374 F. App'x 979 (Fed. Cir. 2010).

Further, the RFQ put quoters on notice that all aspects of their Program Manager's experience (or lack thereof) would be open to evaluation, requiring quoters to include resumes for their Program Manager that included his or her "[e]xperience . . . , area(s) of work in which [he or she] is qualified . . . , [and] concise descriptions of experience for each position held." AR Tab 58g at 606. SAIC cannot plausibly claim that it was surprised or prejudiced by the Agency's

consideration of DHS experience.  Indeed, SAIC recognized the relevance of DHS experience in various places in its quotation, including its Management Approach.  AR Tab 88 at 1989 ("███████

████████████████████████████████████████████

████████████████."); *id.* at 1991 ("█████████████████████████

████████████████████████████████████████").

Because DHS reasonably assessed Mr. ████████ lack of DHS experience as a concern bearing on SAIC's overall technical capability, SAIC's protest ground fails.

> **2.      SAIC Fails To Demonstrate Any Error In DHS's Evaluation Of SAIC's Use Of ████████████████████.**

SAIC next challenges DHS's negative assessment of SAIC's proposed use of ████ ████████████ as part of its ███.  Pl. Br. at 16-18.  SAIC contends that the Agency penalized it for employing ████████████████ that, according to SAIC, were "the very type of innovation" called for by the RFQ.  *Id.* at 17.  SAIC also argues that DHS failed to adequately document its determination that SAIC's ████████████████ were in conflict with DHS's "emphasis on consistency and reliability."  *Id.* (citing AR Tab 103 at 2702 and AR Tab 104 at 2717).  It further argues that DHS's "claimed concern with consistency and reliability ignores SAIC's explicit features designed to ████████████████████████████████."  *Id.* at 18.  As explained below, SAIC's mere disagreement with technical judgments is insufficient.

In its technical quotation, SAIC proposed an ███ that, among other things, promised to "integrate[] ████████████████" and apply "█████████████████████████ ███████████ AR Tab 88 at 1995; *see also id.* at 1999 ("███████████████████

████████████████████████████████████████████

████████████████████████████).  SAIC notably did not define the vague term ████████ in its quotation or explain its significance to the evaluation criteria. ████████████████████████████████████████████ ████████████████████



In his best value determination, the CO found that SAIC's ███████████████ "may conflict with the government's emphasis on consistency and reliability (vs. rapid iteration with new technology)." AR Tab 103 at 2702. The Selecting Official also cited SAIC's "reliance on ██████████████████" as among several factors that "raise doubts about [SAIC's] execution capability" and that, combined with "conflicting approaches and inaccuracies, reduce confidence in SAIC's ability to deliver reliable program management for DSS 3.0." AR Tab 104 at 2717.

SAIC argues that DHS should have embraced ████████████████ rather than viewing them negatively. Pl. Br. at 17. But the Agency's exercise of discretion was reasonable, and the Court need not "substitute its judgment for that of the agency." *PricewaterhouseCoopers Pub. Sector, LLP v. United States*, 126 Fed. Cl. 328, 350 (2016). SAIC is solely responsible for drafting a clear quotation. *SSI Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 743 (2024) (protester has the burden to submit a well-written proposal with adequately detailed information that allows for a meaningful review). Yet it used the vague and undefined term ███████████ four times in Volume 2 without offering any meaningful explanation or context of what that term may mean. AR Tab 88 at 1990 (citing ██████████ as among the "███████████" of SAIC's proposed ███); *id.* at 1995 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *id.* at 1999 ("████████████████████████████████████████████████████████████████████████████████████████████████████"). DHS had broad latitude to interpret SAIC's quotation and evaluate it against the RFQ's evaluation criteria. SAIC's mere disagreement is insufficient to establish error. *See ASRC Fed. Tech. Sols., LLC v. United States*, 169 Fed. Cl. 372, 385 (2024) ("The agency's assessment

████████████████████████████████████████████████████████████████

14

of AFTS's proposed staffing levels and its potential risk to performance are matters committed to [the agency's] discretion and expertise, which the Court will not second guess.").

SAIC's argument that DHS's statements about ███████████████ lack "contemporaneous, meaningful explanation" likewise fails. Pl. Br. at 17-18. As noted above, solicitations pursuant to FAR Subpart 8.4 are subject to a lower standard of review. FAR 8.405-2(f). In a FAR Subpart 8.4 procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 496. And to determine that an agency failed to provide sufficient explanation, a plaintiff must show that the "agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The CO offered a sufficient explanation consistent with FAR Subpart 8.4's lenient standard when finding that SAIC's ████████████████ appeared to be inconsistent with consistency and reliability. *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 496. DHS was under no obligation to offer more explanation, and SAIC cites no authority to the contrary. *See Harmonia Holdings Grp., LLC v. United States*, 167 Fed. Cl. 448, 467 (2023) ("Plaintiff provides no caselaw requiring more than an explanation from the agency."). SAIC also fails to cite any record evidence indicating that DHS failed to consider an important aspect of the problem, offered an explanation that runs counter to evidence, or made a decision that is so implausible as to not be ascribed to a

difference in view or the product of agency expertise. AR Tab 103 at 2702. Accordingly, SAIC's argument fails.

SAIC once again asks the Court to substitute its own judgment for the Agency's when it argues that DHS ignored "explicit features" in its SAIC's quotation. Pl. Br. at 18. According to SAIC, it proposed a framework "expressly aimed" at ████████████████████████████ ████████████████████████████████████████████ " but DHS failed to acknowledge or credit such safeguards when examining SAIC's ████████████████ *Id.* (citing AR Tab 88 at 1995). SAIC further argues that DHS relied on an "unsubstantiated premise" that "'innovation' inherently conflicts with stability." *Id.* These assertions merely attempt to re-argue information in its quotation that was properly considered by the technical evaluators. The Court is in no position to second-guess the Agency's judgments.

### 3. The Agency Did Not Apply Unstated Evaluation Criteria When Observing Flaws In SAIC's Approach.

SAIC's argument that DHS applied unstated evaluation criteria when evaluating its ████ ████████████ is similarly unavailing. Am. Compl. ¶¶ 57-61 (Count IV); Pl. Br. at 19. Asserting that the RFQ did not state that DHS would assess quotations for "consistency and reliability," SAIC argues that it was penalized for "proposing an innovative, cost savings framework on the speculative basis that innovation could compromise consistency and reliability," and thus DHS used an "unstated preference for static delivery over the RFQ's express call for cost efficiencies 'through the use of ***innovations***." Pl. Br. at 19 (quoting AR Tab 58g at 611).

As noted above, to succeed on such a claim, SAIC must show that DHS "used a significantly different basis in evaluating the proposals than was disclosed" and that SAIC was prejudiced as a result. *Banknote*, 56 Fed. Cl. at 386-87. SAIC fails on both counts. DHS did not use a significantly different basis than the one in the RFQ when it determined that ████████ ████████████████████████████████████████████████████

16

████████ could undermine "consistency and reliability." SAIC fails to establish that "consistency and reliability" are significantly different from what DSS 3.0 contemplated. The concepts of consistency and reliability are inherent in this RFQ for desktop support services. That the RFQ did not use the exact terms of "consistency" or "reliability" is not the issue. *See Forestry Surveys & Data*, 44 Fed. Cl. at 497 ("an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor") (internal quotation marks and citation omitted). The Agency's reference to "consistency and reliability" was proper and in accordance with the RFQ.

### 4. SAIC Has Only Itself To Blame For Errors In Its Quotation.

SAIC challenges DHS's determination that SAIC made incorrect and potentially misleading statements in its quotation related to ████████. Pl. Br. at 20-23. But SAIC is solely responsible for errors in its quotation, and DHS reasonably assessed them as problematic.

In his best value recommendation, the CO cited "significant concerns about accuracy" in SAIC's quotation, noting that SAIC "repeatedly claims to have already created ████████ ████████ using past tense for these statements, which is confusing and factually incorrect, raising questions about accuracy in their claims and potentially misleading representations of their capabilities." AR Tab 103 at 2702; *see also* AR Tab 101 at 2672 (citing "factually incorrect" statement in SAIC's quotation as lowering expectations of success). The Selecting Official likewise cited SAIC's "misleading claims" regarding ████████ as among several things that "raise doubts about" SAIC's "execution capability." AR Tab 104 at 2717.

SAIC fails to establish any error or irrationality in DHS's judgments. In its technical quotation, SAIC wrote that it "███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████

17

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ AR 88 at 1990 (emphasis added). Focusing on past-tense verbs like "created," DHS reasonably interpreted this sentence to claim that SAIC already had developed ████████████████████████████████, which, as SAIC does not dispute, is not accurate. AR Tab 103 at 2702; AR Tab 101 at 2672; AR Tab 104 at 2717. DHS's conclusion that the statements were therefore confusing, factually incorrect, and potentially misleading was entirely sound.[2]

SAIC tries to shift blame onto DHS for its own assertions, arguing that DHS should have understood from the "grammatical structure" of the sentence and words like "provides" that SAIC was describing proposed capabilities, not past work. Pl. Br. at 20. But SAIC cannot overcome the fact that SAIC's use of the past tense in its quotation ("already created ██████████████ █████████") gave the Agency the incorrect impression that SAIC had already created ██████ ████. To the extent that SAIC's quotation was vague or ambiguous, that is its fault alone. *See Mission1st Grp., Inc. v. United States,* 144 Fed. Cl. 200, 213 (2019) ("It is axiomatic that the burden is on the offeror 'to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'") (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)); *see also SSI Claimsnet*, 170 Fed. Cl. at 743 (protester had the "burden 'to submit a well-written proposal with adequately detailed information that allow[ed] for a meaningful review' by the VA")

---

[2] SAIC wrongly argues that DHS was required to seek "clarification" from SAIC regarding its ███████████. Pl. Br. at 22. Clarifications with offerors is a concept applied in FAR Part 15 negotiated procurements that is not contemplated in FAR Part 8 procurements such as this, and seeking clarifications in FAR Part 15 procurements is discretionary. FAR 15.306(a)(2) & FAR 8.4. DHS was thus under no obligation to ask SAIC to clarify anything.
████████████████████████████████████████████████████████████

18

(citation omitted); *Structural Assocs.*, 89 Fed. Cl. at 744 ("Plaintiff's failure to provide more detailed information is chargeable to it alone.").[3]

SAIC insists that DHS "disregarded contextual statements" in its quotation showing its intent to describe activities that "would occur during performance" and not in the past. Pl. Br. at 21. For example, SAIC cites a heading titled "███████████████████████████████ ███████████████████████████████████" and statements below it regarding "██████ ██████" including that it "████████████████" certain things. *Id.* (citing AR Tab 88 at 1990, 1992-93). It also cites language from its quotation describing ████████████ and delivery activities that would occur during the first ██ days of performance. None of those statements unambiguously clarifies or corrects SAIC's assertions regarding a ████████████. DHS's finding that SAIC's verbiage was confusing, if not misleading, is unrebutted.

### 5. DHS Rationally Determined That SAIC's Quotation Reflected "Outdated" Technical Knowledge.

SAIC next challenges DHS's determination that SAIC's proposed use of "traditional ████████████████████" reflected an "outdated ████████████████" and indicated that "SAIC may not be current with platform evolution." Pl. Br. at 23 (citing AR Tab 101 at 2672).

SAIC asserts that DHS's finding is unsupported, but ignores the record evidence directly substantiating DHS's finding. Pl. Br. at 23. Explaining that the █████████████████████ that SAIC proposed were an "outdated" architecture, the TET explained that, "[f]or over two years, ████████████ has been pushing towards █████████████████████████████████████████

---

[3] Quoting *22nd Century Technologies, Inc. v. United States*, 176 Fed. Cl. 389, 398 (2025), SAIC asserts that an agency must give a proposal "a fair reading and a reasoned response" and may not disregard information "without explanation." Pl. Br. at 20. But DHS's interpretation of SAIC's statements in its quotation was fair, reasoned, and amply explained in the record.

████, indicating that SAIC may not be current with platform evolution." AR Tab 101 at 2672. In support of this statement, the TET cited a July 2021 article regarding ██████████ ████. *Id.*; *see* AR Tab 125 at 3175. That article, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ *Id.* at 3178. The article explains that ████████████████████ is a response to that problem, offering customers a ████████████████████ ████████████████████████ with various advantages over prior approaches. *Id.* at 3179.

SAIC disputes that its use of ████████████ is "outdated" by touting purported benefits of its proposed solution. Pl. Br. at 23. SAIC proposed a "████████████" as a "████████████" within "████████████████████████████████████" AR Tab 88 at 1990. SAIC claims that its ████████████████ is "████████████████ ████████████ citing its own quotation volume. Pl. Br. at 23. These arguments merely attempt to second-guess DHS's technical judgments.

SAIC strains to find inconsistencies in the record when it argues that DHS's evaluation of its ████ under Factor 2 "cannot be reconciled" with its "conflicting" evaluation under Factor 3, Technical Solution. Pl. Br. at 24. Even a cursory inspection of the record refutes SAIC's argument. The Agency's separate evaluations of SAIC's proposed use of ████████████ under Factors 2 and 3 are entirely consistent. Under Factor 3, DHS credited SAIC's "technical solutions" as demonstrating a "forward-thinking approach" and highlighted SAIC's "████████ ████████████████" which "████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

20

███████████████████ " AR Tab 103 at 2702. There is nothing irreconcilable between, on the one hand, saying that ███████████ are "outdated" relative to new capabilities, and, on the other hand, citing forward-looking attributes of SAIC's "██████████████████████████." The record does not even indicate what differences exist between ███████████ and ████████████████ ████████ but common sense dictates that they are separate and distinct. If anything, the evidence cited by SAIC reflects a nuanced evaluation under a different evaluation factor.

Because DHS's evaluation of SAIC's proposed ███████████████ under Factor 2 was rational and neither arbitrary nor capricious, SAIC's protest ground should be rejected.

### 6. SAIC's Unequal Treatment Argument As To Factor 2 Fails.

SAIC argues that DHS treated it unequally by "failing to credit SAIC for the same substantive features and capabilities it credited to CACI" under Factor 2. Pl. Br. at 25. According to SAIC, DHS should have credited its SLA approach, which it argues was "substantively identical" to CACI's, and that it likewise should have received credit for its "innovative cost savings measures[.]" *Id.* at 26-28.

To prevail on a claim of disparate treatment, a protester must show that (1) the "agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" and (2) the protester was prejudiced. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). As the Federal Circuit has recognized, equal evaluation of proposals "does not translate into identical evaluations" and agencies need not "assign dissimilar proposals the same evaluation rating." *Id.*; *TISTA Sci. & Tech. Corp. v. United States*, 177 Fed. Cl. 600, 622-23 (2025) (rejecting disparate treatment claim because there was "at least one real difference between the proposals").

███████████████████████████████████████████████

As explained below, SAIC and CACI offered substantially different approaches, and DHS acted neither unequally nor unfairly when evaluating them differently.

> ### a. DHS's Evaluation Of Different SLA Approaches By CACI And SAIC Does Not Reflect Disparate Treatment.

Under the RFQ, one of the elements of a proposed Management Approach that quoters had to propose was a description of "how the quoter proposes to measure, assess, report, and manage service level objectives and agreement (SLO and SLA) compliance and performance execution." AR Tab 58g at 605. Under Factor 2 of the RFQ, the Agency was required to "evaluate the degree to which the quoter demonstrates a sound Management Approach" that includes considering how "the quoter proposes to measure, assess, report, and manage service level (SLO and SLA) compliance and performance execution." AR Tab 58g at 611.

SAIC argues that its approach under this evaluation factor was substantively identical to CACI's; the record establishes otherwise. In its quotation describing its approach to SLAs for purposes of Factor 2, CACI outlined the virtues of its ███████████████████ ████████████████████████████████████████████ ███████████████ AR Tab 64 at 694; AR Tab 101 at 2655.

DHS credited CACI for having "███████████████████████████, which demonstrated they are already thinking ahead. ████████████████████ ████████████████████████████████." AR Tab 103 at 2709. DHS further found that CACI's quotation "████████████████████████████████ ████████████████████████████████████████████ ████████████████" AR Tab 103 at 2713.

Without taking issue with the finding that "[n]o other vendor" had the same approach as CACI, SAIC nevertheless asserts that its approach was "substantively identical." In support of

22

this statement, SAIC argues that both it and CACI "



" Pl. Br. at 25 (citing AR Tab 64 at 694 and AR Tab 88 at 1993). But these record sections actually refute SAIC's claims. *Id.* For example, CACI's approach to SLAs focused on its ███████████████████████████████████████████. AR Tab 64 at 694. The ████████████████ process included "████████" such as an "████

████████████████████████████████████████████████

███████████████████████████████ AR Tab 64 at 694. By contrast, SAIC's proposed approach to SLAs ████████████████████

██████████████████████████████████████████████████.

AR Tab 88 at 1993-1994.

Ignoring the many differences between the quotations, SAIC focuses on seemingly similar words or phrases appearing in the quotations like "████████████," and "████████." Pl. Br. at 25. But the mere presence of words like these is unsurprising; there is likely to be *some* level of similarity among quotations given that quoters are all being assessed against the same standard in the RFQ: how will they "measure, assess, report, and manage service level (SLO and SLA) compliance and performance execution." AR Tab 58g at AR611. *See TISTA Science & Tech.*, 177 Fed. Cl. at 623 (explaining that the mere fact that both offerors proposed things required by the Performance Work Statement was not a "relevant similarity for disparate treatment purposes" because those things were required for "all offerors"). Because SAIC fails to establish that its quotation was identical to CACI's, its disparate treatment claim fails.

**b. DHS Was Under No Obligation To "Credit" SAIC For Features In Its Quotation That DHS Reasonably Did Not View Favorably.**

Nor can SAIC establish that it was treated disparately compared to CACI under Factor 2's requirement that quoters propose an "approach to reduce cost and find program efficiencies (such as through the use of innovations)." AR Tab 58g at 605.

In giving CACI a High Confidence rating under Factor 2, DHS noted that CACI's

"███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████"

AR Tab 103 at 2698. DHS also credited CACI's proposed "████████████████████

████████████████████████████████████████

██████████████████████████████████" *Id.*

Without contesting the reasonableness of these findings, SAIC argues that it should have received similarly favorable comments from the evaluators. But the quotations submitted by CACI and SAIC contain substantively distinguishable features. For example, CACI proposed ███████

███████████████████████████████████████,

whereas SAIC's proposed approach to innovation was █████████████████████

████████████████████████████████████████

██████████████ AR Tab 103 at 1995. *See also id.* at 1990 (██████████

████████████████████████████████████████

████████████████████). As explained above, DHS reasonably found that SAIC's ██████████████ were a negative feature. AR Tab 103 at 2702. It is not this

████████████████████████████████████████

████████████

24

Court's place to second-guess the Agency's careful evaluations of different approaches from different quoters. *Office Design Grp.*, 951 F.3d at 1372. As has been established, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449. DHS was under no obligation to credit SAIC's ideas for innovation, and its evaluation was neither disparate nor unequal.

SAIC's disparate treatment argument is further refuted by the record evidence establishing that the Agency found that certain aspects of SAIC's approach to innovation were positive while others were not. For example, the Agency listed SAIC's "███████████████████ ██████" and "████████████████████████████" as among the various features that "[r]aises [e]xpectations of [s]uccess." AR Tab 101 at 2671. But DHS found that SAIC's "██████████████████████████████████████████ ████████████████████████████" *Id.* at 2672. SAIC fails to establish any error or unequal treatment in these reasonable determinations.

## C. DHS's Evaluation Of SAIC's Quotation Under Factor 3 Was Not Unequal.

SAIC argues that DHS treated it disparately under Factor 3 because CACI was credited for an aspect of its Very Important Person ("VIP") Support response under Scenario Six while SAIC was not. *See* Pl. Br.at 28-30. The Court should reject this argument too. SAIC can neither establish that its quotation was "substantively indistinguishable" from CACI's quotation under Factor 3, Scenario Six, nor show that it was prejudiced by this fringe argument. As with its other claims, SAIC is simply nitpicking with DHS's evaluation, which is insufficient for the Court to disturb the Agency's reasonable actions. *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290 (2022) ("Challenges to 'the minutiae of the procurement process in such matters as

technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.'") (quoting *E.W. Bliss*, 77 F.3d at 449).

### 1. SAIC Has Not Demonstrated That Its Quotation Was "Substantively Indistinguishable" From CACI's Quotation.

As noted above, SAIC must demonstrate that its quotation was "substantively indistinguishable" from CACI's proposal in order for the Court to "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Office Design Grp.*, 951 F.3d at 1773. SAIC has not met that standard.

As the basis of its argument for disparate treatment under Factor 3, SAIC focuses on a single feature of CACI's quotation that DHS identified as a reason for raising "Expectations of Success" for CACI under Factor 3. Pl. Br. at 28-29. Specifically, in evaluating CACI's response to Scenario Six, DHS noted that CACI's response demonstrated ███████████████████ ██████████████████████████████████████████████████████████" quoting from CACI's proposal. *See* AR Tab 101 at 2657. SAIC now claims that ███████████████ ████████████████████████████████ pulling from different sections of its own Scenario Six response to argue that it proposed the same "communication/expectation-setting feature" yet received no similar recognition from the Agency. Pl. Br. at 29.

But SAIC exaggerates the similarities of the offerors' proposals. As an initial matter, Scenario Six *required* offerors specifically to address the question of "How do you set expectations for VIP users when the SLA allows for a longer resolution time?" AR Tab 58c at 587. This naturally means that *any* responsive quote from any offeror included a "communication/expectation-setting feature," so merely claiming that SAIC, like CACI, proposed

██████████████████████████████████████████████████████████ is insufficient to claim that the quotations were "substantively indistinguishable."

Further, a close review of each offeror's Scenario Six response demonstrates that SAIC's quotation does *not* "mirror" CACI's approach. As the TET noted, CACI's proposal focused on █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████" AR Tab 101 at 2657; *see also* AR Tab 64 at 720. CACI thus presented a concrete, straightforward approach to explaining █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.

SAIC, by contrast, focused on entirely different aspects in its response to the Scenario Six question, establishing ████████████████████████████████████████████████

*See* AR Tab 88 at 2018. As just one example of differences between the responses, SAIC emphasized that its approach "████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████" *Id.* CACI's response did not discuss any ████████████

████████████████████████████████████████████

In short, although both offerors addressed communications and expectation management with VIP as required by the Scenario Six prompt, the similarities end there. Consequently, the two offerors' quotations were *not* the same, and it was well within DHS's discretion to find that CACI's

████████████████████████████████████████████████████

27

██████████████████████████ approach increased its expectations of CACI's successful performance more so than SAIC's █████████████████ approach. As a result, SAIC has not demonstrated that its ████████████████ approach was "substantively indistinguishable" from CACI's █████ practical approach, and the Court should reject SAIC's argument. *See LB&B Assocs., Inc. v. United States*, 160 Fed. Cl. 710, 737 (2022) (noting that "Plaintiff instead argues the proposals 'have to be read . . . in their entirety,' however that is not the *Office Design* standard for disparate treatment which plaintiff agreed applied" and finding no disparate treatment because plaintiff could not demonstrate its proposal was "substantively indistinguishable" from awardee's) (citation omitted).

### 2. SAIC Cannot Establish Any Prejudice From The Alleged Disparate Treatment.

Even if SAIC could establish that its quotation response to Scenario Six was "substantively indistinguishable" from CACI's response, it still cannot prevail on this allegation because the record demonstrates that SAIC was not, and could not be, prejudiced by any such error. SAIC has cherry-picked one of many strengths identified in CACI's Factor 3 response, but it has not articulated any reasonable explanation as to how this one feature, even if credited to SAIC, would have impacted DHS's selection decision. Both offerors already received High Confidence ratings for Factor 3, and neither the CO's award recommendation memorandum nor the Selecting Official's award decision document mention this feature of CACI's quotation or identify it as one of the discriminators between CACI and any other offeror in conducting the best value tradeoff. *See generally* AR Tabs 103, 104. Simply put, this one positive aspect of CACI's quotation did not play a material role in the selection decision, so crediting SAIC with this same feature would have no effect ***at all*** on the outcome of this competition.

28

As the Federal Circuit has articulated, "[t]o prevail, [plaintiff] must show that this instance of unequal treatment was prejudicial." *Office Design Grp.*, 951 F.3d at 1373. Moreover, "[t]o establish prejudicial error, a protestor must show that but for ***that*** error, the protestor had a substantial chance of receiving a contract award." *Id.* at 1373-74 (emphasis added). "*De minimus* errors in the procurement process do not justify relief." *Id.* at 1374.

SAIC weakly claims that "[b]y withholding the credit" for this one positive trait of CACI's quotation, "DHS distorted the qualitative comparison that was required." Pl. Br. at 30. SAIC insists that "[e]qual credit for this feature would have removed a perceived discriminator in CACI's favor on Factor 3 or, at a minimum, enhanced SAIC's qualitative standing within the same High Confidence rating," and that by "[c]orrecting this error, together with the other identified evaluation defects, would have given SAIC a substantial chance of award." *Id.*

The Court should reject this generalized and unsupported assertion, for several reasons. First, there is no basis for SAIC's assertion that credit for this one feature of its Scenario Six response would have "enhanced SAIC's qualitative standing within the same High Confidence rating." Both quoters already received High Confidence ratings for Factor 3, yet the record demonstrates there were significant substantive differences between those two adjectival ratings. *See*, *e.g.*, AR Tab 103 at 2707-08. The Agency identified 29 features of CACI's quotation that raised its "Expectations of Success" under Factor 3, versus only eight features of SAIC's quotation. *Compare* AR Tab 101 at 2656-59 *with id.* at 2671-72. Merely adding one more item to this list— bringing SAIC to a grand total of nine—would have no material impact on the "qualitative comparison" between the offerors.

Second, SAIC is incorrect in its assertion that this one feature actually served as a "perceived discriminator" between the quotation. CACI's VIP Support response is not mentioned

29

at all in the CO's best value tradeoff. *See* AR Tab 103 at 2711-14. And the Selecting Official does not mention VIP Support in his description of his findings for Factor 3, nor does he include VIP Support as one of the six reasons he selected CACI as the best value quoter, AR Tab 104 at 2716-18. In short, while CACI's VIP Support was identified as one (out of 28) feature of CACI's quotation that supported a High Confidence rating for Factor 3, the record does not demonstrate this one feature played any role whatsoever in DHS's best value tradeoff. As a result, crediting SAIC with the same feature would have no effect whatsoever in any comparison of the two offerors and would not increase SAIC's chance of winning the contract in the slightest.

Third, and finally, SAIC fails to argue that it was prejudiced specifically by this alleged evaluation error, and thus has abandoned any such argument. The best SAIC can muster is that this alleged disparate treatment, "***together with*** the other identified evaluation defects," would result in SAIC having a substantial chance at winning the contract award. Pl. Br. at 30 (emphasis added). Leaving aside for the moment SAIC's nebulous claim that only a combination of all of its protest allegations together could have resulted in a substantial chance at award, SAIC cannot reasonably claim that correcting this one instance of purported disparate treatment would have resulted in a substantial chance of it receiving the BPA. Neither logic nor the record support such an assertion, meaning that, as a matter of law, SAIC cannot establish the requisite prejudice for this alleged error in the evaluation. *See Ascendant Servs.*, 160 Fed. Cl. at 287-89 (discussing the requisite prejudice standard and noting that such cumulative assertions of prejudice do not meet the plaintiff's burden of proof). Thus, the Court should reject this allegation.

**D.    DHS's Determination That CACI Is The Best Value Is Sound And In Accordance With The RFQ.**

SAIC further challenges DHS's reasoned judgment that CACI's superior technical approach merited the payment of a price premium as determined by Average Labor Rate. Pl. Br.

at 30-33. Faced with a record demonstrating both that DHS adhered to the Solicitation's evaluation scheme and produced a reasonably documented tradeoff decision preferring CACI's superior approach, SAIC resorts to inventing a $▉ million price difference between the two offerors to argue that the Agency's careful balancing of technical and price factors should be overturned. *Id.*

As explained below, the Court should reject this *post hoc* argument. The Agency **did not** find that there was a $▉ million difference between the two quotations, and there is zero basis for SAIC's claim. In any event, the record reflects that the Agency did exactly what it was required to here under the relatively lenient standard under FAR Subpart 8.4. *See generally* AR Tabs 101-04. SAIC's disagreement with the Agency's documented judgment weighing the merits of each offeror's approach (and the substitution of its own "analysis" of the price differential between the offerors) is not a sufficient basis to override the Agency's discretion and does not demonstrate that the Agency's action here were unreasonable or contrary to law. *STG Int'l, Inc. v. United States*, 165 Fed. Cl. 577, 585 (2023) (finding that a best-value contract will not be overturned for "[m]ere disagreement." "Rather, the agency's decision must instead be arbitrary, which will not be the case when the 'agency documents its . . . decision and includes the rationale for any business judgments and tradeoffs made.'") (citations omitted).

**1.      DHS Meaningfully Considered The Total Average Labor Rate Price Differences Between CACI And SAIC And Reasonably Determined That CACI Was The Best Value Based On Its Superior Technical Approach.**

Contrary to SAIC's argument, DHS did ***not*** neglect to consider the price difference between CACI's and SAIC's Total Average Labor Rates.  It was precisely ***because*** of this difference that the Agency conducted the best value tradeoff analysis.   And the record demonstrates both that the Agency adhered to the RFQ's selection methodology and that it conducted a reasonable tradeoff in making its best value determination.

Best-value determinations are an inherently judgmental process with which courts must be hesitant to interfere.  *See Galen Med.*, 369 F.3d at 1330.  "Procurement officials have substantial discretion to determine which proposal represents the best value for the Government."  *E.W. Bliss Co.*, 77 F.3d at 449.  That discretion is even broader here under a FAR Subpart 8.4 procurement. Pursuant to FAR 8.405-2(f), the contracting officer must document "[t]he rationale for any tradeoffs in making the selection."  FAR 8.405-2(f)(5).  However, "[t]he amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15." *Matt Martin Real Estate Mgmt. LLC v. United States,* 96 Fed. Cl. 106, 116-17 (2010); *accord Allied Tech. Grp.*, 94 Fed. Cl. at 50; *Trillion ERP Venture*, 161 Fed. Cl. at 550-51 ("As compared to procurements under FAR part 15, procurements under FAR subpart 8.4 are subject to fewer documentation requirements.") (citing FAR 8.405-3(a)(7)(viii)).  Instead, the Court should analyze the contracting officer's tradeoff decision "to determine whether it is reasonable and within the agency's discretion."  *Distributed Sols.*, 106 Fed. Cl. at 24; *Allied Tech. Grp.*, 94 Fed. Cl. at 50 (denying plaintiff's MJAR and finding, in the context of a FAR Part 8 procurement, that "CO's best value determination . . . was coherent and a reasonable exercise of his discretion").

SAIC claims that the Selecting Official's "reasoning does not reflect a meaningful tradeoff," and that the Agency minimized the difference in price between the offerors in concluding that CACI's quotation represented the best value. *See* Pl. Br. at 31-33.[4] Although SAIC argues the tradeoff reflects a "conclusory preference for the highest-rated, highest-priced offeror,"[5] *id.* at 32, that is not SAIC's decision to make, nor is it the Court's. *Vertex AeroSpace, LLC v. United States*, 142 Fed. Cl. 755, 776 (2019) ("[A] best-value determination should not be disturbed so long as the agency documents its final award decision and includes a reason for any business judgments and tradeoffs made."). In a FAR Subpart 8.4 procurement such as this, all the Agency needed to do was document its tradeoff during its evaluation, which it did here. *See Reli Group*, 174 Fed. Cl. at 641 ("FAR Subpart 8.4 imposes minimum documentation requirements, including a rationale for an agency's tradeoff in making its award decision.") (citing FAR 8.405-2(f)(5)). It is within ***the Agency's*** discretion to evaluate the relative merits of each offeror's technical approach as compared against the value presented in the proposed price; and here, the Agency exercised that discretion reasonably.

SAIC's primary challenge to the best value tradeoff rests on an unsupported assertion that a price difference of $▮▮ million exists between SAIC and CACI. That is incorrect. The RFQ stated that offerors' pricing would be evaluated on the basis of Total Average Labor Rate—not the

---

[4] SAIC also faults the Agency for "not confront[ing]" the pricing "magnitude" SAIC claims to exist. Pl. Br. at 32. But as explained herein, SAIC exaggerates the magnitude by asserting a non-existent $▮▮ million price differential. In any event, DHS did properly consider the price differential between the two quoters.

[5] It is not clear why SAIC portrays CACI as the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* AR Tab 104 at 2715. Indeed, the Agency itself recognized the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 2716.

total value of the BPA or an estimate of the offeror's complete performance.  AR Tab 58g at 612; AR Tab 58m (cell A89).  As a result, the basis for the price evaluation here—and the information utilized in the best value tradeoff—was ***not*** a total estimated price for the entire contract, but only each offeror's Total Average Labor Rate.  *See* AR Tab 103 at 2710-12; AR Tab 104.  In accordance with that announced evaluation scheme, and unchallenged by SAIC, the Agency determined a Total Average Labor Rate of $████ for CACI and $████ for SAIC.  AR Tab 102 at 2676.  Thus, that is the price difference the Agency was required to consider in its tradeoff analysis, and the only pricing evaluation the Court need consider in reviewing the Agency's actions.

SAIC exaggerates the price differential by purporting to calculate a hypothetical $████ ████ price difference.  As described in SAIC's amended complaint, it calculated this $████ ████ figure by multiplying the percentage difference between the quoters' Total Average Labor Rates with an assumed 90% of the announced maximum value of the BPA.  *See* Am. Compl. ¶ 26. SAIC then insists that the result of this calculation—$█████████—represents a valid estimate of CACI's "price premium" that the Agency was required to consider.

SAIC's approach is neither reasonable nor consistent with the record.  As an initial matter, if the Agency ends up spending 90% of the BPA's maximum value, it will have spent 90% of the BPA's maximum value, regardless of which contractor was performing the work.  The Government would pay each contractor the same amount regardless of order type, labor rates, performance approach, etc.  Also, contrary to SAIC's assumption that DHS will "spend[] 90% of the BPA's maximum value of $983 million on labor," *id.*, it is impossible to know now how much of the BPA's maximum value the Agency will ultimately spend during the course of performance. The nature of a BPA is that it is flexible and allows DHS to issue orders based on its needs, and there is no basis to assume any level of spending under the maximum value.

34

SAIC's $▮▮▮▮ figure rests on a further unreasonable assumption: that CACI would receive exactly 90% of the BPA's maximum value and that SAIC would receive exactly ▮▮% less than that amount over the course of the BPA. But for those assumptions to bear out, several things would necessarily have to be true: ***every order***, for the next five years, (1) would need to be a cost-reimbursement order against which SAIC or CACI would be charging labor hours; (2) both quoters would need to have the exact same staffing mix, (3) the exact same technical approach, (4) the exact same labor hour estimates, (5) the exact same indirect rates, (6) the exact same fee or profit structure, and (7) the exact same labor escalation over the entire period of performance. Such assumptions are totally unrealistic, particularly when the BPA itself contemplates the award of at least some fixed-price orders. *See* AR Tab 58g at 617.

Moreover, information actually in the record further undermines SAIC's exaggerated "price premium" assertions. As just two examples:

- The RFQ identified just one position as Key Personnel for the contract: the Program Manager. AR Tab 58g at 602. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* AR Tab 102 at 2683 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)); *id.* at 2684 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Consequently, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- SAIC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮%). AR Tab 102 at 2681. That means that, over ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



the course of the BPA, ██████████████████████████████████

████████████████████████████████.

Consequently, SAIC's $██████████ "price premium" is entirely fantastical and practically useless. The Court should refuse SAIC's attempts to insert such extra-record information into this protest and instead ground its review in the information actually present in the record.

Instead of engaging in its own speculation, the Agency relied upon the evaluation documented in the record in conducting its best value tradeoff. In making the Agency's selection decision, both the CO and the Selecting Official began by summarizing the technical evaluation of each of the ██ offerors. *See* AR Tabs 103, 104. Both officials' summaries specifically delved beneath the adjectival ratings to identify specific components of CACI's quotation that the Agency found meritorious, concluding that, despite similar adjectival ratings to other offerors, CACI's quotation was technically superior. *See*, *e.g.*, AR Tab 103 at 2708 ("CACI's zero learning curve, established relationships, and systematic improvement processes uniquely position them to deliver transformative results while maintaining operational excellence, making their response superior to the other four offerors."); AR Tab 104 at 2716 (noting that, for the reasons discussed, "████████████ ████████████ received ratings of High Confidence on two factors each, CACI's response is stronger").

Both officials also reviewed and accurately acknowledged the evaluated Total Average Labor Rates for all ██ offerors, documenting that SAIC's Total Average Labor Rate was lower than CACI's. AR Tab 103 at 2710; AR Tab 104 at 2715. As a result, both officials then embarked upon a comparative evaluation, weighing CACI's technical superiority against the lower pricing of ████████████. AR Tab 103 at 2711-14 (noting "[a] tradeoff is required among the quotations from CACI, SAIC, ████████████. CACI's quotation was technically superior to

████████████████████████████████████████
████████████████████████████

the other two, but at a premium price"); AR Tab 104 at 2716-18. And as documented in the record, both the CO and the Selecting Official concluded that CACI's technical superiority warranted the payment of a price premium, documenting six specific discriminators that set CACI's proposed approach apart and, in their reasoned discretion, provided the best value to DHS. *See* AR Tab 103 at 2713-14; AR Tab 104 at 2717-18. Thus, contrary to SAIC's argument, the Agency did ***not*** neglect to consider CACI's price premium; instead the Agency reasonably concluded that the technical features of CACI's quotation merited paying a price premium, which is entirely within its discretion to decide. There is simply no reason for the Court to disturb this rational and documented judgment made by knowledgeable Agency officials. *Connected Global Solutions, LLC v. United States*, 162 Fed. Cl. 720 (2022) ("under a best value tradeoff analysis it is reasonable for an agency to decide that the higher price of a higher-technically-rated proposal is justified").

Besides attempting to substitute its own judgment for the Agency's, SAIC places undue weight on the language of the Solicitation stating that technical factors, when combined, were only "more important" than price, as opposed to "'significantly' more important." Pl. Br. at 31, 33. Yet SAIC has cited to no case law indicating the absence of the word "substantially" has any practical effect on the agency's tradeoff process, particularly within the flexible context of a FAR Subpart 8.4 procurement. Indeed, in another decision, this Court reviewed a protest to a FAR Part 8 award involving the same "more important" weighting language in the solicitation and was untroubled by any semantic distinction between the two phrases. *Distributed Sols., Inc.,* 106 Fed. Cl. at 24 (concluding that even when solicitation provided only that non-price factors were "more important than price," CO's use of "significant" in tradeoff analysis was "merely to explain that price was outweighed by the non-price factors" which was "in accordance with the solicitation").

The upshot here is that the Agency properly considered the non-price factors to be more important than price, and thus reasonably concluded that CACI's superior technical quotation—including six expressly identified discriminators—rendered CACI's quotation to be more advantageous than SAIC's lower-priced, but lower-quality quotation. AR Tab 104 at 2717-18.

Consequently, the Agency reasonably exercised its discretion in conducting the best value tradeoff and properly documented its analysis. Thus there is no basis in the record to disturb the Agency's reasoned judgment. *Blackwater Lodge*, 86 Fed. Cl. at 514 ("Mere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious.").

### 2. SAIC's Second Challenge To DHS's Best Value Tradeoff Is Derivative Of Its Other Protest Grounds And Therefore Fails.

SAIC's remaining challenge to the best value tradeoff is an entirely derivative challenge that can be summarily denied. SAIC argues that because the Agency's Factor 2 and Factor 3 evaluations were arbitrary and capricious, the selection decision utilizing those purportedly unreasonable evaluations is itself arbitrary. Pl. Br. at 34-35. However, as demonstrated above, the Agency's evaluation was reasonable, documented, and in accordance with the terms of the Solicitation. As a result, it was reasonable for the Agency to utilize those evaluations in its tradeoff decision. *Newimar*, 160 Fed. Cl. at 133 ("A derivative best-value challenge cannot stand on a rejected challenge to another aspect of the agency's evaluation."); *Ace-Federal Reporters, Inc. v. United States*, 150 Fed. Cl. 94, 122 (2020) ("Since the Court finds the [agency's] evaluation of the technical and past performance factors was rational, the [agency's] best value determination accordingly did not err."). Thus, the Court should deny this protest allegation as well.

E.  **SAIC Fails to Demonstrate Prejudice.**

As the Federal Circuit has explained, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Importantly, "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision," and therefore, SAIC must establish prejudice for this Court to sustain its protest. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). As other decisions have framed this requirement, in order to prevail, the protester "must demonstrate 'that it [is] within the zone of active consideration.'" *Newimar*, 160 Fed. Cl. at 131 (quoting *Allied Tech. Grp.*, 649 F.3d at 1326).

SAIC has not and cannot make such a showing here. First, SAIC fails to argue that any one of its perceived errors in the Agency's Factor 2 evaluation, ***by itself***, prejudiced SAIC and would have resulted in SAIC having a substantial chance at receiving the contract award. *See* Pl. Br. at 34 (relying on "multiple, compounding errors" and arguing that "[c]orrecting these errors"—plural—could have resulted in raising SAIC's Factor 2 adjectival rating). As a result, SAIC has not even asserted that, absent prevailing ***on all of its arguments***, it suffered any competitive prejudice here, thereby implicitly acknowledging that standing alone, none of its arguments is sufficient to demonstrate a substantial chance at winning the award and warrant Court interference in the procurement process. *See Data Gen.*, 78 F.3d at 1563 (noting the prejudice standard exists in part to maintain the importance of "averting unwarranted interruptions of and interferences with

the procurement process"); *Newimar*, 160 Fed. Cl. at 131-32 (holding that protester failed to establish from alleged use of undisclosed evaluation criteria).

Second, neither of SAIC's unequal treatment arguments, standing alone, is alleged to have prejudiced SAIC here. As discussed above, SAIC's Factor 3 unequal treatment argument involves such a minor aspect of CACI's quotation that neither the CO nor the Selecting Official even mentioned it in their tradeoff evaluation of the offerors' quotations, let alone relied on it in finding CACI had submitted the superior technical quotation. And even if SAIC were correct in its allegation relating to the Factor 2 SLA discriminator for CACI, the Agency also identified *five other discriminators* in CACI's technical quotation that warranted the payment of a price premium. So SAIC's unequal treatment arguments would not move it any closer to the zone of active consideration.

Third, and most importantly, even if SAIC were to succeed on all of its arguments, it *still* has not adequately demonstrated that it would have made any difference at all in the Agency's selection decision. SAIC argues that "[h]ad DHS conducted a proper evaluation, SAIC's Factor 2 rating would have improved, SAIC would have been recognized for having the same discriminators as CACI, and SAIC's technical proposal would have been equal or better quality than the awardee's at a materially lower cost." Pl. Br. at 35. Yet SAIC grossly overstates the importance of these errors in the Agency's evaluation and tradeoff process.

Assuming it is correct about all of its Factor 2 arguments, SAIC might in theory have received a High Confidence Factor 2 rating, the same adjectival rating CACI received. But as the record demonstrates, a proper evaluation involves looking behind the adjectival ratings. *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 409 (2021) ("Adjectival ratings by themselves are not determinative because proposals with the same adjectival rating are not

40

necessarily of equal quality.") (citation modified). Here, there were numerous features of CACI's Factor 2 quotation that the Agency called out as valuable and that none of SAIC's purported weaknesses would similarly cover. *Compare* AR Tab 101 at 2654-56 (identifying 25 points from CACI's Factor 2 quotation raising expectations of success), *with id.* at 2671-72 (identifying just 12 points from SAIC's Factor 2 quotation raising expectations of success). So while SAIC's adjectival rating might have improved but for the alleged errors, SAIC has not demonstrated how remedying these purported issues would have impacted the Agency's determination that CACI's technical quotation was superior to all others. *See*, *e.g.*, AR Tab 103 at 2708 ("CACI's response stands out as superior to the other four offerors due to its unique combination of incumbent knowledge, proven performance, and innovative methodologies tailored to DHS requirements."). As a result, there is no prejudice. *Superior Waste Mgmt. v. United States*, 169 Fed. Cl. 239, 295 (2024) ("Failure to demonstrate prejudice is fatal to Superior's arguments.").

Further, there is no basis to find that addressing SAIC's unequal treatment arguments—focused on just one of six discriminators the Agency identified within CACI's quotation—"would have eliminated" CACI's advantages or would have resulted in SAIC being "recognized for having the same discriminators" as CACI. Pl. Br. at 35. Eliminating *one* technical discriminator would do nothing to change the fact that the CO and Selecting Official identified *five other discriminators* in CACI's quotation that warranted paying a price premium. *See* AR Tab 103 at 2713-14; AR Tab 104 at 2717-18; *see also Newimar*, 160 Fed. Cl. at 132 (noting that protester could not establish prejudice because agency had identified five discriminators favoring awardee but protester challenged only three, so the awardee would still maintain its advantage).

As a result, there is no basis in the record for SAIC to claim that remedying the purported errors would magically render "SAIC's technical proposal . . . equal or better quality" than CACI's.

41

Pl. Br. at 35. If SAIC were to prevail on all of its protest arguments, it might result in a higher adjectival rating under one factor, and the removal of one discriminator. But it would not change the fundamental differences between CACI and SAIC that led the Agency to reasonably conclude that CACI's technical approach—including its incumbent knowledge, relationships, and experience—was worth paying a price premium. *See* AR Tab 103 at 2713-14; AR Tab 104 at 2717-18. *See also Nat'l Energy Sec. Operations, LLC v. United States*, No. 25-774, 2025 WL 3265335, at *16 (Fed. Cl. Sept. 30, 2025) (finding no prejudice in the aggregate of all protester's allegations, noting that removing one weakness "would not change the overall trade-off calculus because SSP had five other discriminators in its favor for the Management Approach" and that the "loss of one discriminator for the CAS element would not disturb SSP's overall lead"). As a result, SAIC has not met its burden of proving prejudice and its motion should be denied. *Newimar*, 160 Fed. Cl. at 132 ("Newimar's unspecific allegations that it was prejudiced by the Navy's procurement process fail to establish that Newimar was in the 'zone of active consideration' for the award but for the Navy's alleged errors.").

### F.     SAIC's Request For A Permanent Injunction Should Be Denied.

"While the Court of Federal Claims has power to grant injunctive relief in a bid protest action, 28 U.S.C. § 1491(b)(2), the award of injunctive relief is 'extraordinary' and should be granted only in limited circumstances." *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 467 (2008) (citing *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)). A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the

public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

SAIC cannot succeed on the merits of its protest allegations. Therefore, SAIC is not entitled to a permanent injunction. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) (achieving success on the merits "is a necessary element for a permanent injunction"); *SSI Claimsnet*, 170 Fed. Cl. at 753 ("As neither SSI nor Availity have succeeded on the merits of their protests, no injunctive relief is warranted in this case.").

Because SAIC cannot succeed on the merits, this Court need not consider the remaining injunction factors. Even so, this Court should deny SAIC's request for a permanent injunction. SAIC has provided no factual evidence of any purported harm beyond a conclusory claim that, without injunctive relief, it will lose an opportunity to compete for the award. Pl. Br. at 36. Therefore, SAIC has failed to demonstrate any irreparable harm. Instead, SAIC relies exclusively on generic case law and brief attorney statements, having failed to provide any declaration or evidence to show actual harm from the Agency's actions. *See Chromalloy San Diego Corp. v. United States*, 145 Fed. Cl. 708, 744 (2019) ("Protestors may not rely on attorney argument to establish irreparable injury."). Without a factual showing of actual harm, let alone harm that could credibly be claimed as irreparable, SAIC is also not entitled to injunctive relief under the second factor, which itself dooms SAIC's request. *Mitchco Int'l, Inc. v. United States*, 151 Fed. Cl. 537, 550 (2020) ("Plaintiff has shown neither success on the merits nor that it will suffer an irreparable injury absent the sought injunction. We thus need not consider the other factors. No relief is warranted.").

Similarly, because SAIC has not demonstrated any actual irreparable harm, the Court cannot find in favor of SAIC on the remaining two factors. Without proof of harm, there is no

43

hardship against which the Court can balance the equities. Further, an injunction here is not in the public's interest because the IT services provided here are of critical importance to DHS and its continuing operations, which include matters of public safety. As decisions of this Court have noted, "there is a significant public interest in ensuring the safety of United States citizens," which weighs in the Agency's favor and against injunctive relief. *See Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496, 534-35 (2017) ; *see also Global Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 211 (2018) ("The court also recognizes the 'paramount import' of the public interest in protecting services related to national defense and national security."). Because the Agency requires these IT services, and an injunction would delay DHS's ability to obtain them and could disrupt its operations, the public interest here favors the Government and not SAIC, whose allegations lack merit.

## V.    CONCLUSION

For these reasons, CACI respectfully requests that the Court grant CACI's cross-motion for judgment on the administrative record, deny SAIC's motion for judgment on the administrative record, and enter judgment for the United States and CACI.

Dated December 5, 2025

Respectfully submitted,

*s/ Alexander O. Canizares*
Alexander O. Canizares
Vinson & Elkins L.L.P.
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6540
acanizares@velaw.com
*Attorney of Record for Intervenor-Defendant CACI NSS, LLC*

44

*Of Counsel*:

Tyler E. Robinson
trobinson@velaw.com
Leslie Edelstein
ledelstein@velaw.com